IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL ANN CERNIGLIA; D. BARRETT GOUGH; JILL KORBER SMALL; and GAIL WOLFE | Civil Action |
| Plaintiffs, | No. 2:22-cv-733 |
| v. | |
| SEWICKLEY ACADEMY, | |
| Defendant. | JURY TRIAL DEMANDED |

**CIVIL COMPLAINT**

Plaintiffs, by undersigned counsel and pursuant to Fed.R.Civ.P. 8, files this Civil Complaint seeking legal and equitable relief.

**I. Jurisdiction**

1. The Jurisdiction of this Court is invoked pursuant to Section 1 of the Civil Rights Act of 1866, 42 U.S.C. §1981 and 28 U.S.C §§1331 and 1343(a)(3).

**II. The Parties**

2. Plaintiff Michael-Ann Cerniglia is an adult individual who resides at 103 Ferndale Avenue, Sewickley, Pa., 15143. At all times relevant, she was Chair of Defendant's Senior School History and Social Sciences Department.

3. Plaintiff D. Barrett Gough is an adult individual who resides at 514 Eloise Street, Pittsburgh, Pa., 15212. At all times relevant he was employed as a teacher in the History and Social Sciences Department in Defendant's Senior School.

4. Plaintiff Jill Korber Small is an adult individual who resides at 5 Greenview Drive,

1

Jeannette, Pa., 15644. At all times relevant she was employed as a teacher in the English Department of Defendant's Senior School.

5. Plaintiff Gail E. Wolfe is an adult individual who resides at 2442 Beechwood Boulevard, Pittsburgh, Pa., 15217. At all times relevant she was employed as a teacher in the History and Social Sciences Department of Defendant's Senior School.

6. Defendant Sewickley Academy (SA) is a corporation, which operates an independent pre-kindergarten to secondary school in Sewickley, Pennsylvania. Defendant's principal place of business is 315 Academy Avenue, Sewickley, Pennsylvania 15143. At all times relevant to this action, Defendant employed each Plaintiff.

### III. Factual Background

**Defendant's Board of Trustees Adopts Diversity, Equity and Inclusion Initiatives To Accurately Teach and Address Issues of Racial Intolerance and Injustice in Society.**

7. In May, 2019, Defendant's Board of Trustees adopted diversity, equity, inclusion and social justice initiatives (DEISJ) as part of its strategic plan.

8. The DEISJ Initiatives were adopted in Defendant's realization, as expressed by its then Head of School that: "Racism is not a black people's problem to solve – it is a white people's problem to solve," but that the path forward to justice and equality will require a partnership among all people, coming together in solidarity to do the work necessary to move us forward as a society. As a start, we need to band together to dismantle the structures that oppress and dis-empower."

9. To that end, SA's then Head of School promised SA would continue to do its part to raise awareness and educate its students so they can see injustice and therefore become part of the solution.

10. SA's Head of School likewise committed the institution to supporting the growth of its faculty and staff. As the then-Head of School announced, "Minds must change, and so must hearts, but this is only possible if we create the spaces where positive, constructive, affirming dialogue can take place. Until we can realize the dream that Martin Luther King Jr. had for his children, that they be judged by the content of their character and not by the color of their skin, we must resist racism. We must protest. We must say 'enough'. More than that, we must act and do the hard things that need to be done to create a more equitable and just society for all, not just for some. And the only way we will make progress is by addressing the one thing that has always kept this country from achieving the true fulfillment of her extraordinary promise: racism and the legacy of slavery that haunts us even to this day."

**Seeking to Restore The School To "What It Used To Be," A Parents' Group Complains The DEISJ Initiative Is Really Teaching "Critical Race Theory."**

11. On or about June 1, 2021, a group of SA parents, billing themselves as the Sewickley Parents Organization, wrote to SA's families and leaders, indicating that the DEISJ Initiative was actually Critical Race Theory dressed in sheep's clothing. The "Parents Organization" admitted that the DEISJ did not specifically include any courses on or based on Critical Race Theory, but noted that the concept does not have a static, narrow definition and is constantly evolving.

12. Rather, the "Parents Organization" characterized the DEISJ plan as a product of the Southern Poverty Law Center, which it characterized as a "highly political" organization that opposes white supremacy in school and teacher education, curricula, school discipline policies, school facilities, and classroom climates.

13. Although never so accused the "Parents Organization's" June 1, 2021 letter denied that

its continued focus on academic excellence, as opposed to subjective social justice is code for white supremacy.

14. Critical Race Theory is an academic tool that has been used in law schools and graduate school level courses in other disciplines since the 1970s to debate the idea that racial discrimination is embedded in United States' law, social constructs, and economic policies.

15. The "Parents Organization" maintains a website in which it says it wants to ensure SA continues providing "an educational environment free of political bias and social indoctrination."

16. The "Parents Organization" also has placed advertisements in local publications demanding the removal of activism from the classroom.

17. In response to the "Parents Organization" June 1 letter, SA's Board of Trustees reached out shortly thereafter to determine what the Organization sought.

18. On July 1, 2021, SA's Board of Trustees announced the departure of the Head of School, Kolia O'Connor in what it called "a change in leadership...in the best interest of the school."

19. Immediately after removing O'Connor, the SA Board of Trustees appointed Ashley Birtwell, a member of its Board, as Interim Head of School, and subsequently appointed Ms. Birtwell as Head of School.

20. Shortly thereafter, Ms. Birtwell expressed a commitment "to restore the school to what it used to be..." during conversations with a parent.

21. Ms. Birtwell, indeed, circulated an email from that parent reiterating that commitment to members of SA's administrative's team.

**Defendant Fires Every African American Member of its Administrative Team, As Well as An African American Faculty Member.**

22. A week later, on July 21, 2021, Defendant fired five members of its Administrative Team and one faculty member. That teacher was the lone African American member of its Lower School faculty, a nationally recognized authority on teaching students of color in independent schools. Defendant replaced her with a white teacher who had recently resigned..

23. Every African American member of Defendant's Administrative Team was eliminated in the July 21, 2021 firings.

24. Defendant's July 21 firings eliminated, *inter alia*, Douglas Leek, its Director of Admissions and Financial Aid, an African American who was replaced one week later by his white subordinate.

### Defendant Associated Dr. Leek with Critical Race Theory

25. Dr. Leek was known to Defendant's Interim Head Birtwell as being highly involved in expanding racial and ethnic diversity in independent schools. Birtwell likewise viewed Dr. Leek as heavily associated with the CRT.

### Dr. Leek Sues Defendant For Race Discrimination.

26. Following his discharge, Dr. Leek sued Defendant alleging he was fired because of his race and therefore denied the same rights to contract as is enjoyed by white citizens, in violation of 42 U.S.C. §1981.

27. The elimination of Dr. Leek, as well as the firing of Defendant's entire African American administrative population in July 2021, caused a firestorm of opposition at Defendant's school among both the faculty and students.

28. Shortly after Defendant fired its entire African American administrative population in July 2021, Plaintiffs both individually and collectively opposed and objected to the anti-Black racism

inherent in such action.

29. On Aug. 16, 2021 Ms. Birtwell, admonished Ms. Cerniglia for "stirring the pot" concerning racial issues at SA.

30. Indeed, Defendant viewed each Plaintiff as ring leaders of this opposition and viewed them as "pot-stirrers."

31. On several occasions, Defendant's administrative leaders, including Ms. Birtwell, Ken Goleski, Assistant Head of School; Robert Allison, Human Resources Director; and Michael Cesario, Interim Head of Senior School, informed Plaintiffs that they should get over "the past" and not engage in discussion about "the past.".

32. "The past" became a code word among Defendant's administrators for Defendant's elimination of its entire African American administrative population in the summer of 2021.

33. Defendant instructed its faculty to stop talking about "the past" and specifically instructed that Plaintiffs:

(A). Not discuss "anything racially controversial" in an African American History class, or discuss "current events;"

(B). Assure that African American history classes teach "both sides" of issues such as slavery;

(C). Get over elimination of Defendant's African American Administration population;

(D). Stop "supporting folks who were trying to discuss things in the past;"

(E). Stop supporting folks who opposed the discharge of the entire African American administration population.

34. Ms. Birtwell, and Mr. Goleski questioned why faculty members were "fixated" on the lack of DEISJ issues in job descriptions.

### The Social Justice Button

35. On or about September 3, 2021, each Plaintiff, to demonstrate their support of Defendant's now de-emphasized DEISJ plan, and their opposition to the race-based firing of Dr. Leek along with the rest of Defendant's African American administration population, began to wear a button with the definition of social justice from SA's website. The Button said:

> "Social justice is the view that everyone has a role to play in furthering equal social, political and economic rights and opportunities for all."

36. Plaintiffs continued to wear these Buttons until March 4, 2022.

37. The Buttons were intended to oppose both the July 2021 discharge of Defendant's entire African American administrator population and its only African American elementary teacher as well as Defendant' pull back from its now-de-emphasized DEISJ plan.

38. Defendant viewed Plaintiffs wearing of the aforesaid Button as opposing its discharge of its entire African American administrator population, and objecting to the race discrimination inherent in Defendant's plan to de-emphasize its DEISJ plan

39. For example, Defendant's Assistant Head of School, Goleski criticized the wearing of the Button as creating a "false equivalency" and noted that the wearing of such a message was designed to "keep a wound open and it projects onto children."

### Ms. Cerniglia

40. During the summer 2021, Ms. Cerniglia also opposed a directive from Michael Cesario, Interim Head of Defendant's Senior School, that an African American history elective not talk about

"anything controversial or discuss current events."

41. Cesario directed Ms. Cerniglia to assure that the class taught "both sides" of the issues such as slavery and the lived experience of Black Americans. Ms. Cerniglia opposed such limitations.

42. During this same series of conversations, Ms. Cerniglia also said she was concerned how the firing of Defendant's entire African American administrative population would affect the students of color attending SA.

43. Ms. Cerniglia also opposed a directive from Cesario, that an African American history elective not talk about "anything controversial or discuss current events."

### Dr. Wolfe

44. On or about August 26, 2021, Dr. Wolfe opposed the firing of Dr. Leek, citing the fact that enrollment actually increased during his tenure, and that Defendant's claims otherwise were pretexts to hide race based employment decisions.

45. In response Cesario said he was displeased with Dr. Wolfe's inability "to move forward under new leadership" and suggested she get over the elimination of Defendant's African American Administration population.

46. A week later, Cesario informed Dr. Gough that complaints had been made about his hanging a Black Lives Matter flag in his classroom.

47. Around the same time period, Defendant's Human Resources representative, Robert Allison admonished Dr. Wolfe for acting unprofessionally by, *inter alia*, "supporting folks who were trying to discuss things in the past" and "supporting folks who were berating Cesario." Defendant characterized Dr. Wolfe as the ringleader.

### Ms. Small

48. During the 2020-2021 academic year, Ms. Small and her colleagues determined that the English curriculum should include more texts from authors of color, and less "traditional" works by predominately white male authors. This curricular revision was approved by Defendants's former administrators..

49. However following Defendant's elimination of its entire African American administration population in the summer 2021, Defendant's Interim Division Head Mike Cesario, and Goleski, Assistant School Head, began to object to the emphasis on non-white authors, and to choice reading, which has been found to promote diversity, equity and inclusion, noting that the English Department needed to add more "rigor," to its curriculum.

50. Among educators, the word "rigor" is often used as a dog whistle for canonical works by white authors. Ms. Small pointed out that practices such as choice reading promote diversity, equity and inclusion, to which Goleski repeated that the department is not "rigorous enough" and that he wanted to transform it back to what it used to be.

51. Goleski claimed a lot of evidence exists proving that reading which de-emphasizes the "traditional canon" (works of white male authors) and that includes works by diverse authors is bad for high school level students.

52. Ms. Small objected to such an assertion, and indeed requested to see such research, which never was provided.

53. Goleski instructed that he would henceforth assert final approval of all summer reading books for the English department.

54. In February 2022, Goleski informed Ms. Small that her classes were not following rigorous standards, and informed her that Defendant would not continue her contract for the next

academic year.

### Dr. Gough

55. In addition to wearing a Social Justice Button, and specifically objecting to Defendant's elimination of its entire African American administrator population, Dr. Gough objected repeatedly during the fall of 2021 to the abrupt de-emphasis of racial diversity from both Defendant's curriculum and its employment practices.

56. In November, Defendant became aware that some of the Plaintiffs complained to the Pennsylvania Association of Independent Schools about the racially discriminatory issues arising from Defendant's elimination of its entire African American administrative population.

57. In response to Defendant's identification of Plaintiffs as pot-stirrers and their opposition to the elimination of SA's entire African American administrative staff in July 2021, Defendant "eliminated the positions" of Dr. Gough, and Cerniglia, in February 2022.

58. During the same period, Defendant placed Ms. Small on a Performance Improvement Plan, in which Defendant required that her curriculum and reading lists would have to be approved by Goleski. Ultimately, Defendant claimed she was "uncooperative, contentious and resistant (sic.) to the coaching being provided.

**Defendant's March 3 Melt-Down Concerning A Scheduled Critical Race Theory Discussion; Defendant's Administrators Pretextually Summon Police During Student/Parent Opposition to Race Discrimination; And Then Fire Plaintiffs For Opposing Race Discrimination**

59. On February 22, 2022, Dr. Gough and Dr. Wolfe announced they would be conducting an Opt-In reading and discussion group on the issue of Critical Race Theory, as programing during

Black History Month, and as a way to honor the School's professed commitment to DEISJ, intellectual inquiry and diversity of thought.

60. The "Opt-In" concept is an Optional discussion during the March 3 lunch hour. The first of several planned discussions was scheduled for that date.

61. Dr. Gough and Dr. Wolfe offered this discussion of CRT and the nature of the controversy surrounding the influential body of legal and historical scholarship that supports CRT as a way to oppose race discrimination, and to generate a dialogue about and understanding of this complex topic.

62. SA has historically conducted similar "Opt-In" sessions during free periods on various topics of general student interest. For example, a recent "Opt-In" discussed the situation in Ukraine. The Ukraine "Opt-In" was sponsored by a member of Defendant's faculty.

63. Prior to the March 3 scheduled CRT Opt-In, SA administration had never scrutinized, nor even reviewed the goals, topics, or the tone of discussions of proposed topics presented at these voluntarily sessions conducted during free time.

64. However, the planned March 3, Critical Race Theory Opt-In, sent Defendant's administration and management into a melt-down that ended with police being called, and Assistant Head Goleski summarily firing Dr. Wolfe.

65. This melt-down germinated with a complaint by a parent that two SA teachers, (Dr. Gough and Dr. Wolfe), had informed students they would be presenting an Opt-In on CRT–a topic Assistant Head Goleski found to be verboten.

66. SA's administration and various members of its Board of Trustees informed Plaintiffs that discussing CRT would "escalate tensions in the School."

67. Board Member David Jardini, for example, on March 3, informed Plaintiffs that CRT is

not an appropriate topic of conversation.

68. Defendant's administration insisted the March 3 CRT be cancelled, and, if not, Assistant Head Goleski, Head Birtwell, or Senior School Head Cesario would cancel the program, and there would be "consequences."

69. On the morning of March 3, Ms. Birtwell, and three SA Board of Trustee Members–David Jardini, Ashvin Ragoowansi and Kevin Park– ordered Plaintiffs to meet with them.

70. During the meeting, Dr. Wolfe explained the importance of holding the CRT Opt-In for students of color, because CRT elevates and valorizes their voices, understanding and lived experience..

71. Plaintiffs told Birtwell and the three Trustees that proceeding with the Opt-In was about standing with students of color in a context where their well-being and support system had been progressively eroded by Defendant's Administration.

72. During the March 3 meeting, Defendant's administration and board members instructed Dr. Wolfe and Dr. Gough to "postpone" the Opt-In scheduled for later that day.

73. Ms. Cerniglia and Ms. Small had no specific connection with the Opt-In issue, but Defendant lumped them together with the other Plaintiffs, because Defendant viewed each of the Plaintiffs as part of the pot-stirring, African-American supporters group who opposed Defendant's race-based employment and curriculum decisions.

74. Head Birtwell told Plaintiffs there would be "consequences" for proceeding with the Opt-in and this line of thinking.

75. On March 3, several students requested that Dr. Wolfe accompany them to deliver a petition to Birtwell's office opposing the racial discrimination by Defendant.

76. On that day, a group of 10-15 students, four family members, and Dr. Wolfe walked to the office of Defendant's Head of School, and requested a meeting with Birtwell to deliver the petition.

77. Defendant's representatives informed the group that Birtwell was not available, that the representative did not know where she was, and that the representative was not willing to call Birtwell.

78. Some heated words were exchanged between the family members, Goleski and Defendant's Head of Security, Matthew Elliot. Dr. Wolfe said nothing.

79.. Goleski directed that the Sewickley police be summoned, and then summarily fired Dr. Wolfe, while she was consoling a student who was crying.

80. Defendant told Dr. Wolfe she was fired in front of the students on March 3, because she was "argumentative, and communicated inappropriately with Goleski," and was insubordinate when Goleski requested she assist in de-escalating the situation. Dr. Wolfe did none of those things.

81. Apparently Defendant's discharge of Dr. Wolfe was rescinded because it said no decision was made on March 3, but then fired her again, on March 5.

82. Complying with Defendant's directive, Dr. Gough informed a group of 40 students and 10 faculty members who arrived at their classroom for the scheduled noon Opt-In that the discussion on CRT was postponed, and that the time would be used for students to discuss the days events in which police had been summoned to their school, and one of their teachers fired in their presence.

83. Later that day, Defendant ordered Plaintiffs to leave the premises.

84. Two days later, on March 5, 2022, Defendant fired each Plaintiff pretextually citing in substantially identical letters that their opposition to the school's employment and racial policies and

practices was "uncooperative" "unprofessional" and "contentious."

## Count I
### 42 U.S.C. §1981--Retaliation

85. Plaintiffs incorporate by reference the allegations in Paragraph 1 to 84 as if fully restated.

86. Defendant eliminated Ms. Cerniglia, Ms, Small, and Dr. Gough in retaliation for opposing race discrimination and publically announcing their opposition to such practices.

87. Defendant fired Dr. Wolfe, Ms. Cerniglia, Ms. Small and Dr. Gough from their positions on or about March 3-5, 2022 in retaliation for opposing race discrimination in the firing of Defendant's entire African American administrator population and for publically announcing their opposition to such racially discriminatory practices .

88. Defendant's actions in eliminating and firing Plaintiffs from their positions in retaliation for opposing race discrimination deprived Ms. Cerniglia, Dr. Gough, Ms. Small and Dr. Wolfe of the same right to make and enforce contracts as is enjoyed by white citizens in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

89. Defendant's discharge of Plaintiffs because of their opposition to race discrimination and racially discriminatory practices was part of a pattern and practice of retaliation, and of discrimination on the basis of race with the goal of restoring the school "to what it used to be."

90. Defendant's discharge of Plaintiffs was undertaken with reckless indifference to Plaintiffs' federally protected right to make and enforce contracts irrespective of their opposition to race discrimination.

91. As a direct and proximate result of Defendant's retaliatory treatment, Plaintiffs suffered the following injuries:

      a.      Great mental anguish and emotional strain;

      b.      Humiliation and inconvenience;

      c.      Lost wages and benefits

WHEREFORE, Plaintiffs demand judgment against Defendant pursuant to 42 U.S.C. §1981 as follows:

a. That Defendant be permanently enjoined from retaliating against Plaintiffs because of their opposition to race discrimination and racially discriminatory practices;
b. That Defendant be ordered to reinstate each Plaintiff to the positions they occupied on January 1, 2022;
c. That Defendant be required to compensate each Plaintiff for the diminishment of the career advancement each would have obtained had it not been for Defendant's illegal treatment;
d. That each Plaintiff be awarded compensatory and punitive damages in an amount to be determined at trial;
e. That each Plaintiff be awarded lost back and, if reinstatement is not feasible, front pay;
e. That each Plaintiff be awarded against Defendant the costs and expenses of this litigation, and a reasonable attorney's fee; and
f. That each Plaintiff be awarded such further legal and equitable relief as this Court deems to be just and proper.

Respectfully submitted

SAMUEL J. CORDES & ASSOCIATES

/s/Samuel J. Cordes
Samuel J. Cordes
Pa. ID # 54874

602 Poplar Court
Pittsburgh, Pa., 15238
(412) 435-6309
(412) 519-4663
SJCordes@sjcemploymentlaw.com
Attorney for Plaintiffs

15